New England Mobile Book Fair, Inc. *vs.* City of Boston (and a companion case[1]).

Suffolk. Middlesex.   May 17, 1973, May 21, 1974. — July 2, 1974.

Present: Hale, C.J., Goodman, & Grant, JJ.

*Municipal Corporations,* Liability for tort, Waterworks. *Negligence,* Water pipe, Contractual limitation of liability. *Proximate Cause.*

Evidence warranted findings that negligence of a city in leaving closed a shutoff valve, within its exclusive control, located on a service water pipe extending from a street water main to an adjacent building to supply water to a sprinkler system in the building, whereby the sprinkler system failed to operate properly upon the occurrence of a fire in the building started without fault of the city, was the proximate cause of substantial percentages of damage to the building and to personal property of a tenant

---

[1] Lee Development Company, Inc. *vs.* City of Boston.

therein resulting from the fire, and that the city, which maintained the service water pipe and the shutoff valve as a proprietary function, was liable to the owner of the building and to the tenant for such percentages. [409-415]

Where a city's building code required a sprinkler system in a building and an ordinance and regulation forbade tieing into a water main in an adjacent street without a city official's approval, and accordingly the owner of the building made an application to the water division of the city for a service water pipe extending from the street main to the building to furnish water to the sprinkler system, a provision of the application that the city should not "be held responsible for any damage resulting from . . . any withholding of the water for any cause or reason" did not preclude the owner from recovering from the city for damage to the building caused by failure of the sprinkler system to operate properly upon the occurrence of a fire because the city had negligently left closed a shutoff valve, within its exclusive control, on the service pipe. [415-419]

TWO ACTIONS OF TORT. Writs in the Superior Court dated May 11, 1966, and August 2, 1966, respectively.

The actions were heard by *Tisdale*, J., without jury.

*Lawrence H. Adler (George F. Hurley* with him) for the plaintiffs.

*Gerard A. Powers*, Assistant Corporation Counsel, for the city of Boston.

GRANT, J. These are separate actions of tort brought in the Superior Court by Lee Development Company, Inc. (Lee), as the owner of the building at 1980 Centre Street in the West Roxbury district of Boston, and by New England Mobile Book Fair, Inc. (Book Fair), as the tenant at will of the basement of that building, to recover the damages respectively sustained by them by reason of the negligence of the defendant city in its maintenance of the water supply to the automatic sprinkler system located in the basement of the building. The city's answer in each case contains a general denial and a plea of contributory negligence; in the case brought by Lee the answer also sets up the exculpatory provisions of a so-called fire service application signed by Lee which will be discussed later in this opinion. The cases were consoli-

dated for trial and tried without jury to a judge who filed extensive findings of fact, made certain rulings of law, and ordered the entry of judgments for the city. The cases came to us originally on the plaintiffs' exceptions to the denial of certain of their requests for rulings,[2] to certain express rulings made by the judge in the course of his findings, and to certain other determinations made by the judge which may have constituted rulings. We commence by summarizing the findings originally presented to us.

The brick and concrete building in question, ninety-two feet long and fifty-two feet deep, was constructed by Lee in 1955. The street floor was constructed for and subsequently used as office space. As originally designed and constructed, there was a full open basement which was not finished off; the rafters and wooden subflooring for the first floor were left exposed. Because of the sloping nature of the lot the basement was reached by a driveway which extended downhill from Centre Street to a level area immediately behind the building.

As required by applicable provisions of the city's building code, the basement was equipped with an automatic wet sprinkler system for fire protection purposes. The system originated at a twenty inch high pressure water main in Centre Street which was used for fire protection and other purposes and which was maintained by the water division of the city's public works department. A four inch fire service pipe led from the main to a shutoff valve which was located within the limits of the street and which was under the exclusive control of the water division, and from there through the front foundation wall of the building. That part of the system had been constructed by the water division at Lee's request and expense; the balance of the system was constructed by Lee and remained under its control. Once inside the building, the four inch pipe was fitted successively with a

---

[2] The city does not appear to have filed any such requests.

sprinkler shutoff valve, a check valve designed to prevent the flow of water back in the direction of the street main, a pressure indicating gauge, and a pipe (also equipped with a check valve) leading up to a fitting which was set into the face of the building and is known as a Siamese connection. The purpose of a Siamese connection is to permit the introduction into a sprinkler system of an additional outside supply of water once it is known that a fire has started inside the building. Beyond the pipe leading to the Siamese connection were the branches and laterals of the sprinkler system itself, suspended from the rafters. The laterals were equipped with sixty sprinkler heads[3] which were spaced about ten feet apart and each of which was designed to fuse independently of the others at a temperature of one hundred sixty-five degrees Fahrenheit, to spray water over a radius of about eighty square feet, and to deliver from thirty-five to fifty gallons of water per minute, depending on the pressure in the street main. Once the sprinkler heads should fuse from the heat of a fire, the operation of the system would be dependent not only on there being water pressure in the street main but also on the shutoff valves in the street and inside the building both being left in the open position. The entire system was duly installed, checked, tested, and approved in October of 1955 through the coördinate action of Lee's contractors and the city's water division and building department.

At some point following 1955 a prior tenant of the basement had partitioned off portions of the basement and had installed shelving and an unspecified number of fluorescent lighting fixtures. Plywood partitions extended up to within eight inches or less of the exposed overhead rafters; some of the shelving extended to within

---

[3] The judge stated in his findings that there were only forty-four sprinkler heads, but the plan from which the system was constructed discloses sixty heads. That plan was specifically referred to by the judge in certain other findings, and it would appear from the evidence as a whole that the larger figure is the correct one.

eighteen inches of the rafters; the lighting fixtures hung at least two feet below the rafters and thus below the sprinkler system. The partitions, shelving, and lighting had been installed with the assent and approval of Lee; they were all in place when the basement was first occupied by the predecessor proprietorship of Book Fair, which was engaged in the business of selling hard and soft cover books.

Book Fair used one of the partitioned spaces, which had two sprinkler heads and at least one fluorescent lighting fixture, as a packing room where it made up packages of books for shipment to customers. The packing room contained, among other things, a work table, combustible packaging materials, and shelved books awaiting shipment. The inside shutoff valve and the pressure gauge for the sprinkler system were accessible from this space. The portion of the system located in the basement remained under the control of Lee, which was aware of the nature of Book Fair's business and of the manner in which it used the premises, including the manner in which it utilized the shelving in various parts of the basement for the storage of books.

At approximately 5:00 P.M. on September 1, 1965, a fire was observed to have broken out under the work table in the packing room, which had then been unoccupied for a period of approximately fifteen minutes; cardboard cartons and packaging materials were observed to be on fire. The city's fire department was notified by telephone and subsequently by a box alarm. By 5:15 P.M.[4] the fire department, in accordance with its usual practice in such cases, had started pumping water into the sprinkler system through a two and one half inch hose coupled to one side of the V shaped Siamese connection; a second such hose was coupled to the other side of the connection

---

[4] There appears to have been some delay in the fire department's reaching the scene of the fire, probably occasioned by a failure of communication in the original telephone call to the department. Such delay is not material to the ultimate disposition of the case.

by 5:20 P.M. in order to maintain or further boost the quantity of water in the sprinkler system. Successive alarms were sounded. The combined efforts of the fire-fighters and the sprinkler system proved ineffective, and at approximately 7:00 P.M. the first floor wooden flooring and rafters collapsed in the vicinity of the packing room, thereby smashing the piping in the sprinkler system and rendering the system of no further use. The fire department then ceased pumping water through the Siamese connection, although it continued with hose lines and other efforts until the fire was brought under control and ultimately extinguished several hours later.

No water came out of the sprinkler heads except during such period of time as water was being pumped into the sprinkler system through the Siamese connection. When the fire was extinguished it was discovered that the shutoff valve located inside the foundation of the building had been in the open position when the fire had started. There does not appear to have been any question as to the adequacy of the water pressure in the street main. The following day it was discovered that the sprinkler system had failed to operate as designed and intended because the city's water division had left in a closed position the shutoff valve which was located in that portion of the four inch pipe which lay within the limits of Centre Street. Unbeknownst to either Lee or Book Fair, that valve had been closed for approximately eight years.[5]

The judge found and ruled that the city had been engaged in a proprietary function in maintaining the fire service pipe and the shutoff valve in the street,[6] that the

---

[5] There was uncontradicted evidence that the pressure gauge inside the building would continue to record the water pressure which had existed in the street main at the time the valve in the street was closed if (as here) there was no leak in that part of the system which lay beyond that valve.

[6] That finding was not challenged by the city, perhaps because Lee had paid the city for the original installation of the fire service pipe

city had been negligent in failing to maintain the street valve in an open position, and that such negligence "contributed" to causing the damage done by fire to Lee's building and Book Fair's personal property.  He also found and ruled "that the partitioning, shelving, and lighting fixtures within the basement together with the combustible material by way of books and packaging material kept therein and the fact that smoking was freely permitted in all areas by employees and customers of Book Fair created a substantial and serious fire hazard and that the aforesaid partitions, shelving and lighting fixtures would impede to a considerable degree the full and effective operation of the sprinkler system" and that both Lee and Book Fair had "assumed the consequences of such risk."  He also found and ruled that Lee had been negligent in allowing the basement as partitioned, shelved, and lighted to be used for the storage and handling of combustible books and packaging materials, in permitting smoking therein, and in violating certain provisions of the city's fire prevention code concerning the foregoing, and that "such negligence contributed to causing the fire and the subsequent destruction of its building."  He further found and ruled that Book Fair had been negligent in permitting smoking, especially in and about the packing room where combustible materials were kept in violation of a provision of the fire prevention code, and that "such negligence caused the fire and the subsequent destruction of its property."  The ultimate findings and rulings were that each plaintiff was barred from recovery by its assumption of the risk and its own negligence and that Lee was further barred by the exculpatory provisions of its 1955 fire service application.  It

and had thereafter paid annual flat rate fire pipe service charges even though no water was drawn through the pipe.  Contrast *Fisher* v. *Boston,* 104 Mass. 87, 93-95 (1870); *Tainter* v. *Worcester,* 123 Mass. 311, 316-317 (1877); *Reynolds Boat Co. Inc.* v. *Haverhill,* 357 Mass. 668, 669-670 (1970).

was ordered that judgment be entered for the defendant in both cases.

Following oral argument and further study of the record and briefs we arrived at two tentative conclusions. The first was that, for reasons which will be hereinafter stated, Lee should not be barred. by the exculpatory provisions of its fire service application. The second was that voluntary assumption of the risk should probably not play a part in either case. Assumption of the risk is an affirmative defence which must be specifically pleaded in the defendant's answer (*Winchester* v. *Solomon,* 322 Mass. 7, 11-12 [1947]; see also *Pouliot* v. *Black,* 341 Mass. 531, 533 [1960]); it had not been so pleaded in either answer, and the city had not moved to amend either answer following the judge's promulgation of his findings, rulings, and orders for judgment.

There was uncontradicted evidence, the truth of which was virtually conceded at trial and at oral argument before us, that a sprinkler system such as the one here involved is designed to control or contain a fire which might start through negligence. Neither plaintiff sought to blame the city for allowing the fire to start; the gravamen of each declaration was that the particular plaintiff had suffered a further loss resulting directly from the city's negligence in preventing the proper operation of the sprinkler system. The findings which have been recited or summarized, when considered in the light of the evidence, left us in doubt whether the trial judge thought either plaintiff had been negligent in a manner that had contributed to the whole of the loss sustained by it, in short, whether the existence of the fire had been merely a condition or had been an efficient cause of the almost total destruction of Lee's building and Book Fair's inventory. Compare *Hanifin* v. *C & R Constr. Co.* 313 Mass. 651, 660-663 (1943). Causation is primarily a question of fact (*McKenna* v. *Andreassi,* 292 Mass. 213, 217 [1935]; *Zezuski* v. *Jenny Mfg. Co.* 363 Mass. 324, 328 [1973]), even when negligence is thought to exist by

reason of an actor's violation of a penal statute or ordinance (*Butler* v. *Curran*, 302 Mass. 1, 3-4 [1938]). See *Wall* v. *King*, 280 Mass. 577, 580-582 (1932); *Baggs* v. *Hirschfield*, 293 Mass. 1, 2-4 (1935); *Falvey* v. *Hamelburg*, 347 Mass. 430, 434-436 (1964). See also *Gregory* v. *Maine Cent. R.R.* 317 Mass. 636, 642-643 (1945).

Accordingly, without announcing either of our tentative conclusions, we remanded the cases for further findings on the evidence already before the court as to how far the fire would have spread and as to the extent of the damage which would have been sustained by each plaintiff if the sprinkler system had functioned as designed and intended. We also directed that the parties be given the opportunity to submit further requests for rulings prior to the making of any further findings.

On remand the same judge, after making carefully documented subsidiary findings,[7] made an ultimate finding to the effect that if the portion of the sprinkler system located inside the basement of the building had been properly pressurized during the interval between the time the fire started and the time when water pressure was first introduced into that part of the system by the fire department through the Siamese connection, the fire would have been contained within the immediate vicinity of the packing room. On the same supposition, the judge also found that only ten per cent of Lee's building would have been damaged by fire and smoke and that only thirty-five to forty per cent of Book Fair's inventory would have been damaged by fire, water, smoke, and steam.[8]

---

[7] The judge specifically identified by reference to particular pages of the trial transcript the portions of the evidence relied on by him to support each of his subsidiary findings. The transcript is before us under the provisions of Rule 1:22(12) of the Appeals Court, 1 Mass. App. Ct. 895 (1972).

[8] Book Fair quite properly agrees that this estimate must be considered at its upper limit of forty per cent.

The cases have been returned to us on the foregoing further findings and on the city's exceptions to the denial of its requests for rulings to the effect that the evidence was insufficient to warrant those findings. Further briefs have been filed, and further oral argument has been had.

If the further findings are allowed to stand, we now have definitive determinations by the trial judge that the city's negligence in leaving the street valve in a closed position was the proximate cause of the loss of ninety per cent of Lee's building and the proximate cause of the loss of sixty per cent (see fn. 8) of Book Fair's inventory. Such determinations would also make it unnecessary for us to consider most of the plaintiffs' original exceptions[9] and would make it clear that voluntary assumption of the risk is not a bar to recovery by either plaintiff. The only risk truly material to the plaintiffs' claims was that the street valve would remain in an open position; neither plaintiff was aware of or had any reason to anticipate that the valve would be in a closed position if a fire should start.

1. We now examine the question whether those determinations should be allowed to stand in the light of the principles of causation which have already been stated and the city's exceptions to the denial of its requests for rulings addressed to the sufficiency of the evidence to warrant the further findings of the trial judge.[10]

The first such request was to the general effect that the evidence was insufficient to warrant a finding that the fire would have been confined to the vicinity of the packing room because there was no evidence to warrant a

[9] The majority of those exceptions were to rulings and refusals to rule on the sufficiency of the evidence to warrant findings (1) of negligence on the part of each plaintiff in allowing the fire to start and (2) as to the causal relationship between any such negligence and the losses sought to be recovered.

[10] The city's exceptions to the further findings as findings present the same general questions as those raised by its requests for rulings (see *Muir Bros. Co.* v. *Sawyer Constr. Co.* 328 Mass. 413, 414-415 [1952]; *Superline Transp. Co. Inc.* v. *My Bread Baking Co.* 350 Mass. 364, 365 [1966]) and need not be separately considered.

finding that the sprinkler system was properly pressurized during the interval between the time the fire started and the time when water pressure was first introduced into the system through the Siamese connection. It is undisputed that the system was not properly pressurized during that period. The request overlooks the reason for that fact, namely, the city's negligent maintenance of the street valve in the closed position which had already been found by the judge. We think this request was properly denied for the basic reason that the evidence was sufficient to warrant the finding that the fire would have been contained within the vicinity of the packing room if the sprinkler system had operated properly. The judge had before him copies of the plans by which the building had been constructed, a copy of the approved plan by which the sprinkler system had been constructed and which showed the locations of the various sprinkler heads, evidence as to the area designed to be sprayed by each head which should fuse, and evidence of the quantity of water to be emitted from each such head, all of which he was entitled to evaluate in the light of a blackboard chalk[11] which showed the approximate locations of the various partitions and bookshelves and voluminous oral testimony which was oriented to the chalk generally and to the location of the packing room in particular.[12] The challenged finding was no more than a common sense adaptation of expert testimony already in evidence to the effect that had the sprinkler system functioned as designed and intended, the fire would have been extinguished within the confines of the packing room by the two sprinkler heads located therein. This exception must be and is overruled.

The city's remaining exceptions which have been properly argued (see *Lolos* v. *Berlin,* 338 Mass. 10, 13-

---

[11] Which was photographed, marked as an exhibit, and transmitted to us.

[12] The judge also took a view of the remains of the premises.

14 [1958]) are to the denial of its requests for rulings to the effect that the evidence was insufficient to warrant findings as to the proportions of Lee's building and of Book Fair's inventory which would have been destroyed or damaged by fire and related causes if the sprinkler system had operated as designed and intended. We have carefully reviewed the evidence, particularly the parts specifically identified by the judge (see fn. 7), and are of the opinion that the challenged findings were warranted by the evidence. Compare *Burnham* v. *Dowd,* 217 Mass. 351, 360 (1914); *Birch* v. *Boston & Maine R.R.* 259 Mass. 528, 531-533 (1927); *Dalton* v. *Demos Bros. Gen. Contractors, Inc.* 334 Mass. 377, 378-379 (1956); *Colangeli* v. *Construction Serv. Co.* 353 Mass. 527, 529-530 (1968). They properly isolated the portions of the plaintiffs' losses attributable to the negligence of the city. Compare *Cole Drug Co. of Mass.* v. *Boston,* 326 Mass. 199, 201-202 (1950); *Dalton* v. *Demos Bros. Gen. Contractors, Inc.* 334 Mass. 377, 378-379 (1956); *Bond Pharmacy, Inc.* v. *Cambridge,* 338 Mass. 488, 493 (1959). Contrast *A. DaPrato Co.* v. *Boston,* 334 Mass. 186, 188-189 (1956). These exceptions are also over-ruled.

We conclude that the judge's determinations as to the proximate cause of the losses sustained by both plaintiffs should stand. We have already indicated some of the results which flow from those determinations.

2. We turn now to the questions presented by the exculpatory provisions of the so-called fire service application signed by Lee when it requested the water division of the city's public works department to construct the four inch pipe which would provide the water supply for the sprinkler system which Lee intended to install in the basement of its building. As we have already noted, the trial judge found and ruled that those provisions barred recovery by Lee.

A provision of the city's building code required that a sprinkler system be installed in the basement of the

building. A regulation of the city's commissioner of public works, mandated by ordinance, forbade tieing into the water main in Centre Street without the approval of the commissioner. Accordingly, on June 7, 1955, Lee made application to the water division, on a printed form ("Fire Service Application") supplied by it, for a service pipe to supply the sprinkler system. That form, after eliciting information as to the location and details of the proposed installation and setting out various "Regulations for Service Pipes," concluded with the paragraph set out in the margin.[13] It was those provisions which the city set up in its answer to the action brought by Lee, which the judge applied to Lee in his decision, and which are the subject of one of Lee's exceptions.[14] The judge based his action on the "rule established in" the case of *Bigelow, Kennard & Co. Inc.* v. *Boston,* 254 Mass. 53 (1925), although agreeing that that case presented a "somewhat different factual situation."

In the *Bigelow* case the plaintiff sought to recover for the damage to its building and personal property which had been caused when a break occurred in the four inch fire service pipe leading from the street main to a fire

---

[13] "This applicant is the owner of the estate and agrees — that he will pay the full cost of installing fire service pipe — that he will not use water from said fire service pipe except in case of fire; — that he will conform to all rules, regulations and ordinances relating to pipes or the furnishing and use of water; — that upon any violation of such rules, regulations or ordinances the Commissioner may withhold the use of water at once without further notice, and that neither the City nor its agents nor employees are to be held responsible for any damage resulting from the pipes or the laying or placing thereof nor from any withholding of the water for any cause or reason."

[14] The judge denied Lee's request for a ruling that "[t]he agreement of June 7, 1955 between . . . Lee . . . and the . . . City . . . relieving the City and its agents and employees from responsibility for any damage resulting from any withholding of the water for the sprinkler system for any cause or reason is legally void." We are not concerned with somewhat similar requests submitted by Book Fair, as the judge in his decision did not apply the disputed provisions to that plaintiff.

hose maintained by the plaintiff inside its building. There was evidence tending to show that the pipe had broken because it had been laid in improperly compacted soil.   There was no legal requirement that such a pipe be laid; its sole purpose was to enable the plaintiff to secure lower fire insurance rates.   The city, which had laid the pipe at the plaintiff's expense, pleaded the exculpatory provisions of the plaintiff's fire service application, which were in all material respects identical to those now before us.[15]   The court's discussion of the city's defence appears to have proceeded on the assumption that in laying the pipe the city had been engaged in a proprietary function. In sustaining the validity of the defence the court said, "We see no good reason why a city or town, by its proper officers, may not make a valid contract which exempts the municipality from liability for its negligence in a case like the present.   The contract in question is not opposed to public policy.   The plaintiff has cited no decision of this court which holds such a contract invalid, nor are we aware of any to that effect" (254 Mass. at 57).

Lee argues the factual distinctions between the *Bigelow* case and the present case, pointing to the provisions of the building code which required it to have a sprinkler system and to the ordinance and regulation of the commissioner of public works which effectively required Lee to do business with the water division (the only source of supply) on the latter's terms.   The principal thrust of its

---

[15] As there had been no withholding of water in that case, the city's reliance was necessarily placed on that portion of the exculpatory provisions which read, "neither the City nor its agents nor employees are to be held responsible for any damage resulting from the pipes or the laying or placing thereof."   In the case before us the city must depend for absolution on the words "neither the City nor its agents nor employees are to be held responsible for any damage resulting . . . from any withholding of the water for any cause or reason." See fn. 13.   By distinguishing between the clauses relied on in the two cases we intend nothing more than a suggestion that the *Bigelow* case may be of somewhat more limited precedential value than the city is prepared to concede.

argument, however, is that the subsequent case of *Iver Johnson Sporting Goods Co.* v. *Boston,* 334 Mass. 401 (1956), requires us to hold that the portion of the exculpatory provisions sought to be here invoked (see fn. 15) should be declared void as against public policy.

In the *Iver Johnson* case the plaintiff had lawfully maintained a portion of its basement under the sidewalks adjoining the lot on which its building was located and in proximity to a city water main lying in one of the public streets on which the building fronted. Water escaped into the building when the main broke, and there was evidence of a lack of due diligence on the part of the city in stopping the flow of water from the broken main. The city pleaded in defence an ordinance which provided in part: "Every owner of an estate hereafter maintaining any cellar, vault, coal hole or other excavation under the part of the street which is adjacent to, or part of, his estate, shall do so only on condition that such maintenance shall be considered as an agreement on his part to hold the city harmless from any claims for damage to himself or the occupants of such estate resulting from gas, sewage or water leaking into such excavation or upon such estate." The court held that in maintaining the street main the city had been engaged in a commercial function. It noted that there had been no causal relationship between the location of the basement and the break in the main. It rejected the proffered defence for the reason that "a city cannot by an ordinance create immunity from its own negligence causing damage to an abutter who has made no use of the way which interferes with the public easement" (334 Mass. at 403).

The *Iver Johnson* case and the present case have several significant factors in common. In both cases the plaintiff's property was lawfully positioned with respect to that of the city; in both cases the city was engaged in a commercial venture; in neither case was there any causal relationship between the maintenance of the plaintiff's property and the negligent act of the city which

resulted in the injury to the plaintiff.  Although the decision to strike down the ordinance[16] involved in the *Iver Johnson* case could be rationalized as nothing more than a judicial delineation of the extent of the delegation of the legislative power to regulate the use of public ways, we believe the sounder explanation to be that the court considered the exculpatory provisions of the ordinance to be contrary to public policy.  If the *Iver Johnson* case stood alone, we would unhesitatingly follow it to the conclusion that exculpatory provisions such as those found in the fire service application in the present case are void when sought to be invoked against a captive customer such as Lee.  We know that the *Iver Johnson* case does not stand alone.  The *Bigelow* case exists.  In our view the only substantial basis for distinguishing the present case from the *Bigelow* case[17] is that the plaintiff in that case had a choice whether it would submit to the exculpatory provisions.  If such be an improper distinction, then we are of the opinion that the *Bigelow* case is inconsistent with the *Iver Johnson* case and that we are free to follow either.  We believe the proper result to have been reached in the latter.

We hold that the exculpatory provisions of Lee's fire service application cannot be invoked against it.  Its exception to the denial of its request for a ruling addressed to those provisions (fn. 14) is sustained.

3. We are thus left with two cases in which the additional findings of the trial judge show that Lee is entitled to recover ninety per cent of the damage done to its building during the interval between the outbreak and the extinguishment of the fire and that Book Fair is

---

[16] It makes no difference for present purposes whether the city's claim of immunity is grounded on an ordinance or on the provisions of an express contract.  See *Boston* v. *A. W. Perry, Inc.* 304 Mass. 18, 21 (1939).

[17] The *Bigelow* case was not mentioned in the *Iver Johnson* case. It does not appear to have been cited in any Massachusetts case involving the potential liability of a municipality.

entitled to recover sixty per cent of the damage done to its inventory during the same interval. There was evidence before the judge which warranted findings as to the fair market values of the building and of the inventory both before and after the fire. There is as yet no finding as to the total diminution in the fair market value of the property of either plaintiff. Although the evidence on these points was not disputed (or even subjected to cross-examination), it is not our province to make findings of fact in actions at law, even when all the evidence is before us. It will be a simple matter for the trial judge to make the necessary findings of diminution in fair market value, to apply the foregoing percentages to those findings, and thus to arrive at the total amounts of damages for which judgments are to be entered against the city. The plaintiffs had ample opportunity to prove other or different damages at the original trial, and we see no necessity for entertaining additional evidence.

The exceptions of Lee Development Company, Inc., and of New England Mobile Book Fair, Inc., are sustained; the exceptions of the city of Boston are overruled; the cases are remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*