**WEYERHAEUSER COMPANY,**
Appellant,

v.

**THERMOGAS COMPANY, Appellee,**

**Blackhawk Automatic Sprinklers, Inc.
and Clark Equipment Company,**
Defendants.

No. 98–2222.

Supreme Court of Iowa.

Dec. 20, 2000.

Rehearing Denied Jan. 29, 2001.

Thomas B. Caswell and John C. Goodnow of Zelle, Hofmann, Voelbel & Gette, L.L.P., Minneapolis, MN, and Diane Kutzko and Steven J. Pace of Shuttleworth & Ingersoll, P.C., Cedar Rapids, for appellant.

Joseph M. Barron of Peddicord, Wharton, Thune & Spencer, P.C., Des Moines, Leonard J. Johnson, John G. Hansen, and Brian A. Mark of the Johnson Law Group, L.L.C., Kansas City, MO, and Donald L. Eells of Eells & Sovern Law Office, P.L.C., Cedar Rapids, for appellee.

LAVORATO, Chief Justice.

A jury found against Weyerhaeuser Company in its action against Thermogas Company for damages to Weyerhaeuser's facility stemming from a liquid propane tank explosion. Weyerhaeuser appeals following the district court's denial of its motion for a new trial, raising three principal issues: (1) whether the district court erred in directing a verdict for Thermogas on Weyerhaeuser's claims for strict liability and breach of implied warranty of merchantability, (2) whether the district court erred in refusing to give an instruction that Weyerhaeuser's fault in starting the fire that precipitated the explosion of the liquid propane tank should not be considered, and (3) whether the district court erred in refusing to give the jury a *res ipsa loquitur* instruction on Weyerhaeuser's negligence claim. We reverse and remand for a new trial.

## I. Background Facts and Proceedings.

Weyerhaeuser owns and operates a corrugated container manufacturing plant in Waterloo, Iowa. Corrugated containers are simply cardboard boxes.

During the evening of February 27, 1995, and into the early morning hours of February 28, Larry Henriksen was training Tom Chorny to operate a clamp truck. A clamp truck is a forklift with a pincher-like attachment used to move rolls of paper stock throughout the facility. The truck's fuel source is a liquid propane (LP) fuel tank mounted on the back of the truck. Thermogas Company supplied Weyerhaeuser with fifteen LP tanks each day, its daily LP tank needs. Each day a Thermogas driver would take the empty tanks from the Weyerhaeuser facility and replace them with filled tanks.

Henriksen told Chorny to drive around the roll paper storeroom to familiarize himself with the clamp truck operation. While Chorny was doing this, Henriksen stepped into a nearby room to check on a batch of starch. Starch is used as an adhesive in the construction of the cardboard boxes. A short time later, Chorny interrupted Henriksen to tell him the clamp truck was out of fuel.

After Henriksen and Chorny replaced the empty LP tank on the clamp truck with a full one, Henriksen returned to the starch room and Chorny resumed driving the truck. Chorny was unaware that he was driving the truck with the parking brake engaged. A short time later, Chorny noticed the clamp truck was "smelling funny ... like it was overheating." As he was getting out of the truck, Chorny noticed a thin wisp of white smoke coming from the engine area located under the driver's seat.

Chorny left to tell Henriksen what was happening. As they were returning to the truck, the two saw flames coming out from the underside of the truck. At this time, the flames were not impinging on the LP tank on the truck. Soon the flames increased in size and height, reaching about eight inches beneath the seat and tank area.

Deciding not to fight the fire, Henriksen and Chorny started to exit the building.

Within approximately forty-five seconds, the LP tank exploded, igniting rolls of paper and corrugated boxes in the building. Before they left, another employee, Garry Ihnen, pulled the wall-mounted fire alarm.

Approximately three minutes after Ihnen pulled the fire alarm, fire fighters arrived on the scene. The fire destroyed roughly half of the Weyerhaeuser plant as well as most of its paper stock. Weyerhaeuser sustained approximately $5.8 million in property damage, destruction of inventory, and related costs. Fortunately, no one was injured.

Later, Weyerhaeuser sued Thermogas, Blackhawk Automatic Sprinklers, Inc. (the installer of the manufacturing plant's sprinkler system), and Clark Equipment Company (the clamp truck manufacturer). Weyerhaeuser's claim against Thermogas and Blackhawk included negligence, strict liability, breach of contract, and breach of express and implied warranties. Weyerhaeuser alleged only negligence against Clark.

Weyerhaeuser alleged that the LP fuel tank exploded prematurely during the fire and that the sprinkler system failed to operate properly to extinguish the fire. Weyerhaeuser alleged that Clark negligently designed, fabricated, and tested the clamp truck.

A jury returned a verdict finding Weyerhaeuser seventy percent at fault, Blackhawk five percent at fault, and Thermogas twenty percent at fault. Weyerhaeuser moved for a new trial. Among other things, Weyerhaeuser claimed that the district court erred in (1) directing a verdict for Thermogas on Weyerhaeuser's claims of strict liability and breach of implied warranty of merchantability, (2) refusing to instruct the jury that the cause of the fire was legally irrelevant with respect to the negligence of Weyerhaeuser, and (3) refusing to give the jury a *res ipsa loquitur* instruction on Weyerhaeuser's negligence claim against Thermogas.

The district court overruled the motion, and Weyerhaeuser appealed. Weyerhaeuser has settled with Blackhawk and Clark, so those defendants are not involved in this appeal.

On appeal, Weyerhaeuser reasserts the issues raised in its motion for new trial.

## II. Scope of Review.

How we review a denial of a motion for new trial depends upon the grounds for new trial asserted in the motion and ruled upon by the district court. *Ladeburg v. Ray*, 508 N.W.2d 694, 696 (Iowa 1993). When the motion and the ruling are based on discretionary grounds, we review the district court's ruling for an abuse of discretion. *Id.* When, however, the motion and the ruling are based on a claim that the district court erred on issues of law, our review stands or falls on the correctness of its ruling on the legal question. *Id.* All of the issues Weyerhaeuser raised in its motion for new trial and raises here involve the correctness of the district court's ruling on legal questions.

Our review of rulings on motions for directed verdict is for correction of errors at law. Iowa R.App.P. 4; *James v. Burlington N., Inc.*, 587 N.W.2d 462, 464 (Iowa 1998). We review the evidence in the light most favorable to the party against whom the motion is made. *James*, 587 N.W.2d at 464. In our review we determine whether sufficient evidence existed to submit the issues to the jury. *Id.*

We review refusals to give jury instructions for correction of errors at law. Iowa R.App.P. 4; *Duncan v. City of Cedar Rapids*, 560 N.W.2d 320, 325 (Iowa 1997). The district court must give a requested jury instruction if the instruction (1) correctly states the law, (2) has application to the case, and (3) is not stated elsewhere in the instructions. *Beyer v. Todd*, 601 N.W.2d 35, 38 (Iowa 1999). "Parties are entitled to have their legal theories submitted to the jury if they are supported by the pleadings and substantial evidence in

the record." *Id.* When we weigh the sufficiency of the evidence to support a requested instruction, we review the evidence in the light most favorable to the party seeking the instruction. *Duncan,* 560 N.W.2d at 325. A district court's failure to give a requested instruction does not require a reversal unless the failure results in prejudice to the party requesting the instruction. *Beyer,* 601 N.W.2d at 38.

### III. Strict Liability and Breach of Implied Warranty of Merchantability.

**A. Iowa Code section 613.18(1)(a) (1993).** The district court sustained Thermogas' motion for directed verdict on these two claims based on Thermogas' contention that Iowa Code section 613.18(1)(a) immunized it from liability. Section 613.18(1) provides:

A person who is not an assembler, designer, or manufacturer and who wholesales, retails, distributes or otherwise sells a product is:

a. Immune from suit based upon strict liability or breach of implied warranty of merchantability which arises solely from an alleged defect in the original design or manufacture of the product.

Iowa Code § 613.18(1).

The district court found that Thermogas did not assemble, design, or manufacture the tank that exploded. Instead, the district court found that Thermogas simply filled the tank with its product. On that basis, the court concluded that section 613.18(1)(a) applied and granted Thermogas' motion for directed verdict.

**1. Applicable law.** The issue therefore is whether Thermogas was an "assembler," "designer," or "manufacturer." Of the three terms, "assembler" seems the most appropriate here. The Iowa Code does not define the word. We therefore resort to its common and ordinary meaning. *See Gerst v. Marshall,* 549 N.W.2d 810, 814 (Iowa 1996).

The verb "assemble" means "to bring together or gather together into one place, company, body, or whole." Webster's Encyclopedic Unabridged Dictionary 125 (rev. ed.1996). "Assembler" is defined as "a person or thing that assembles." *Id.* Thus, the dictionary meanings of "assemble" and "assembler" contemplate a person or thing that brings together [two or more] things into a whole.

The dictionary definition of "assembler" closely resembles the definition of "assembler" in a torts liability setting. For example, under the theory of assembler's liability, a party "[that] incorporates a defective component part into its finished product and places the finished product into the stream of commerce is liable for injuries caused by a defect in the component part." *Baughman v. Gen. Motors Corp.,* 780 F.2d 1131, 1132 (4th Cir.1986); *see also Exxon Shipping Co. v. Pac. Res., Inc.,* 789 F.Supp. 1521, 1526 (D.Haw.1991); *Rauch v. Am. Radiator & Standard Sanitary Corp.,* 252 Iowa 1, 9, 104 N.W.2d 607, 611–12 (1960); *Ford Motor Co. v. Wood,* 119 Md.App. 1, ——, 703 A.2d 1315, 1331 (1998); *Comstock v. Gen. Motors Corp.,* 358 Mich. 163, ——, 99 N.W.2d 627, 633 (1959); E.L. Kellett, Annotation, *Products Liability: Manufacturer's Responsibility for Defective Component Supplied by Another and Incorporated in Product,* 3 A.L.R.3d 1016, 1024 (1965); 63 Am.Jur.2d *Products Liability* § 237, at 252 (1996). Under this theory, the assembler is liable even though the assembler did not manufacture the component part. *Baughman,* 780 F.2d at 1132; *Exxon,* 789 F.Supp. at 1526; 63 Am.Jur.2d *Products Liability* § 237, at 252. The rule has been applied in negligence, strict-liability, and breach-of-warranty cases as well. *See* 63 Am. Jur.2d *Products Liability* § 140, at 182; 3 A.L.R.3d at 1038–41.

The evolution of the rule began with the tort of negligence. Under a negligence analysis, courts imposed liability on the assembler of a finished product because of the assembler's duty to test or inspect

those components for defects. *See Nelson v. Coleman Co.,* 249 S.C. 652, 155 S.E.2d 917, 920 (1967); 3 A.L.R.3d at 1024. Through further refinements, the rule evolved to the point at which the assembler of a finished product was held responsible for the failure of a component part if the assembler held out the finished product as its own. *Ford Motor Co. v. Mathis,* 322 F.2d 267, 272–73 (5th Cir.1963). For liability purposes under negligence, courts considered the assembler as the manufacturer of the component parts included in the finished product. *Id.* at 273.

Under strict liability, the focus shifted to whether the assembler sold the defective component part and thus placed it in the stream of commerce. *See generally* Restatement (Second) of Torts § 402A (1965) (imposing liability upon one who sells a product in a defective condition unreasonably dangerous to the consumer).

Whether the theory of liability is negligence, strict liability, or breach of warranty, authorities recognize several justifications for holding the assembler liable for the failure of a component it did not manufacture. One justification that the "the public has a right to expect that a reputable seller will stand behind its goods, and the burden of accidental injuries is properly placed upon those who market the defective component." *Exxon,* 789 F.Supp. at 1527 (citing Restatement (Second) of Torts § 402A cmts. c, e); 63 Am.Jur.2d *Products Liability* § 140, at 183. Another justification is that the assembler is in a position to exert pressure on the manufacturer of the defective component part to enhance the safety of the manufacturer's product. *Exxon,* 789 F.Supp. at 1527; 63 Am.Jur.2d *Products Liability* § 140, at 183.

Other justifications include the following: the assembler derives an economic benefit from the sale of the product that incorporates the defective component; the assembler has the ability to test and inspect the component when it is in its possession; and by including the defective component in its finished product, the assembler represents to the consumer and ultimate user that the component is safe. *Baughman,* 780 F.2d at 1132–33; *Wood,* 703 A.2d at 1331; 63 Am.Jur.2d *Products Liability* § 140, at 183.

■ However, to establish assembler liability, the plaintiff must show that the assembler actually sold or otherwise placed the defective product on the market. *Baughman,* 780 F.2d at 1132 (refusing to hold truck manufacturer liable for defective wheel rim that was placed on vehicle after sale and that manufacturer did not supply); *Exxon,* 789 F.Supp. at 1527 (refusing to hold designer of mooring terminal liable for defective replacement chain). This requirement follows from the elementary principle in tort law that the plaintiff must show a causal connection between the defendant manufacturer and the product. *Ryan v. Eli Lilly & Co.,* 514 F.Supp. 1004, 1006–07 (D.S.C.1981); *see also* Annotation, *Products Liability: Necessity and Sufficiency of Identification of Defendant as Manufacturer or Seller of Product Alleged to Have Caused Injury,* 51 A.L.R.3d 1344, 1349 (1973) (stating that, regardless of theory upon which liability is based, "to hold a producer, manufacturer, or seller liable for injury caused by a particular product, there must first be proof that the defendant produced, manufactured, sold, or was in some way responsible for the product").

One other principle is important here: "[T]he containers in which products are sold are so closely identified with the sale of the product that the container's dangerous propensities are the equivalent of the dangerous propensities of the product itself." *Fulbright v. Klamath Gas Co.,* 271 Or. 449, ——, 533 P.2d 316, 320 (1975).

The Restatement (Second) of Torts is in accord with this rule:

The defective condition may arise not only from harmful ingredients, not characteristic of the product itself either as to presence or quantity, but also from

... the way in which the product is prepared or packed. No reason is apparent for distinguishing between the product itself and the container in which it is supplied; and the two are purchased by the user or consumer as an integrated whole. Where the container is itself dangerous, the product is sold in a defective condition. Thus a carbonated beverage in a bottle which is so weak, or cracked, or jagged at the edges, or bottled under such excessive pressure that it may explode or otherwise cause harm to the person who handles it, is in a defective and dangerous condition. The container cannot logically be separated from the contents when the two are sold as a unit, and the liability stated in this Section arises not only when the consumer drinks the beverage and is poisoned by it, but also when he is injured by the bottle while he is handling it preparatory to consumption.

Restatement (Second) of Torts § 402A cmt. h.

One writer sees the rule as one of common sense:

The tide of decisions has swept away the highly metaphysical distinction between the product and the container in which it is sold, which used to perplex some courts in the food cases. The two are sold as an integrated whole, and it is inconceivable that anyone would buy one without the other. When a bottle of beer explodes and puts out the eye of the man about to drink it, surely nothing should be less material than whether the explosion is due to a flaw in the glass of the bottle or to overcharged contents.

W. Page Keeton, et al., *Prosser & Keeton on the Law of Torts* § 99, at 694–95 (5th ed.1984) [hereinafter Prosser].

■ When the legislature excepted an "assembler" from the immunity provisions of section 613.18(1)(a), we think it had in mind the assembler liability theory exemplified by the foregoing cases. We think all of the justifications for the theory prompted the legislature not to immunize from liability assemblers who incorporate defective component parts into their finished product and then place that product into the stream of commerce.

■ **2. Merits.** Viewing the evidence in the light most favorable to Weyerhaeuser, we think the jury could find the following facts. Thermogas is in the business of providing LP tanks of various sizes, which it fills with liquid propane, to its customers for use on forklifts. It does so by trucking the LP tanks to its customers on a periodic basis. In the case of Weyerhaeuser, Thermogas delivered approximately fifteen LP tanks per day. When delivering the filled LP tanks, the Thermogas delivery person would pick up the empty LP tanks Weyerhaeuser used on the preceding day.

The Thermogas delivery person would place the full LP tanks he delivered to Weyerhaeuser on racks or shelving in a metal shed used solely for LP tank storage. Each day, the delivery person would remove the empty tanks and replace them with filled tanks. As needed, the Weyerhaeuser employees would take the filled tanks and place them on their forklifts and place the empty tanks in the storage shed. In the three years immediately preceding the fire, Weyerhaeuser did not receive LP tank deliveries from any source other than Thermogas.

The tank in question was a 43.5 pound LP cylinder weighing 26.5 pounds when empty. When properly filled to eighty percent capacity, the tank would hold ten gallons of liquid propane. The tank was manufactured in 1980.

According to federal regulations, LP tanks like those used in Thermogas' business must not explode when placed in a fire. The regulations also require suppliers like Thermogas to periodically test or recertify the tanks to ensure they remain safe for use. Once a tank is tested, it need not be retested until the applicable period of certification expires. Earlier testing is required if the tank shows (1) bad dents,

(2) other evidence of rough usage, (3) corrosion to such an extent as to indicate possible weakness, or (4) it has lost as much as five percent of its official tare weight. The tank in question had an early recertification in 1985 and again in 1987. Such early recertifications were unusual and suggested that something had happened to the tank or there was some reason to suspect a problem. At the time of the fire, the tank in question was two and one-half years past its mandatory testing date.

As Weyerhaeuser's expert, Richard L. Simpson, testified, the tank exploded prematurely under the circumstances and the premature explosion must have been caused by a defect in the tank. The tank should not have exploded before fire fighters arrived on the scene.

The container—the tank—cannot logically be separated from its contents—the liquid propane—when the two are placed in the stream of commerce as a unit. The finished product was the LP tank filled with liquid propane, which Thermogas placed into the stream of commerce. Thermogas combined a defective component part—its tank—with its liquid propane.

All the justifications for applying assembler liability to Thermogas exist here. Thermogas derives an economic benefit from the sale of a product that included a defective component. Thermogas had the ability to test and inspect the defective component when it was within its possession. Thermogas also had the ability to exert pressure on the manufacturer of the defective component to enhance the component's safety. Finally, by placing its product into the stream of commerce, Thermogas represented to the consumer and ultimate user—in this case, Weyerhaeuser—that the component was safe. Conversely, Weyerhaeuser had a right to expect that Thermogas would stand behind its product.

Given these facts, we conclude that, as a matter of law, Thermogas was an assembler as that term is used in section 613.18(1)(a). We therefore hold as a matter of law that the immunity provisions of section 613.18(1)(a) did not apply to Thermogas, and the district court erred in concluding otherwise.

**B. Defective, unreasonably dangerous condition.** As to the strict-liability claim, Thermogas seeks to uphold the district court's directed verdict ruling on another basis: there was insufficient evidence that the tank had a defect rendering the product unreasonably dangerous. Thermogas also asserts that the district court was correct in directing a verdict as to the implied-warranty-of-merchantability claim on the alternative basis that there was insufficient evidence that the tank had a defect.

We agree with Weyerhaeuser that *Bredberg v. Pepsico, Inc.*, 551 N.W.2d 321 (Iowa 1996), is dispositive of these contentions. In *Bredberg*, a bottle of pop exploded in the plaintiff's hand, injuring him. We held that "[p]roof that a product was sold in a defective, unreasonably dangerous condition can be made by circumstantial evidence." *Bredberg*, 551 N.W.2d at 326–27.

**1. Defect.** In *Bredberg*, the remains of the exploded bottle were not available for inspection. We held, however, that the plaintiff had produced sufficient evidence of a defect based on expert testimony that the bottle exploded due to a defect in it:

> In our view, plaintiff's testimony, corroborated by [his expert], that the bottle exploded can be weighed by a jury as circumstantial evidence that the bottle and/or its contents were in a defective condition at the time they were placed into the stream of commerce. Assuming that the bottle exploded, as we must in this case, it appears that either the bottle or the pressurized product inside was in a defective condition.

*Bredberg,* 551 N.W.2d at 328 (citations omitted); *see also* Restatement (Second) of Torts § 402A cmt. h.

As mentioned, here, Simpson testified the tank exploded prematurely under the circumstances, and the premature explosion must have been caused by a defect in the tank. Additionally, Simpson conducted tests supporting his "premature explosion" theory. (We describe those tests in more detail later in this opinion.) Also corroborating Simpson's opinion are the early recertifications and testimony about them suggesting a problem with the tank. Additionally, the tank was two and one-half years past its mandatory testing date. Viewing this evidence in the light most favorable to Weyerhaeuser, we conclude there was substantial evidence of a defect in the tank.

■ **2. Unreasonably dangerous.** A product is unreasonably dangerous if the defect is not " 'one contemplated by the user or consumer which would be unreasonably dangerous to him in the normal and intended use or consumption thereof.' " *Bredberg,* 551 N.W.2d at 328 (quoting *Aller v. Rodgers Mach. Mfg. Co.,* 268 N.W.2d 830, 834 (Iowa 1978)).

In *Bredberg,* we said:

> Without hesitation, we believe an exploding bottle of Diet Mountain Dew is unreasonably dangerous as the defect which causes the explosion is not "one contemplated by the user or consumer which would be unreasonably dangerous to him in the normal and intended use or consumption thereof."

*Id.; see also* Restatement (Second) of Torts § 402A cmt. h.

■ We likewise believe that the premature explosion of the LP tank here was unreasonably dangerous because the defect that caused the explosion was not one that Weyerhaeuser as a user or consumer would contemplate in the normal and intended use of the tank. At least a jury could reasonably make that finding based on the evidence before it.

## IV. Refusal to Instruct Jury Not to Consider Cause of Fire in Determining Thermogas' Fault.

Weyerhaeuser requested the following jury instruction, which the district court refused to give:

> In deciding any of Weyerhaeuser's claims against Thermogas, whether for strict liability, negligence, or breach of implied warranty, you are not to consider the cause of the fire when determining the fault, if any, of Thermogas.

Weyerhaeuser is claiming error because the district court did not give this instruction. Thermogas contends the court correctly refused to give the instruction primarily because the instruction was not an accurate statement of the "enhanced injury" doctrine. *See generally Reed v. Chrysler Corp.,* 494 N.W.2d 224 (Iowa 1992) (discussing the theory and elements of the "enhanced injury" (crashworthiness) doctrine). Thermogas also asserts that Weyerhaeuser was not entitled to a jury instruction on enhanced injury because the evidence did not support such a claim. In particular, Thermogas argues that Weyerhaeuser failed to present evidence that (1) Thermogas designed the LP tank that exploded; (2) there was a design defect in the LP tank; and (3) there was an alternative safer design, what injuries would have resulted had the alternative safer design been used, and the extent of enhanced injuries attributable to the defective design.

In addition, Thermogas contends that Weyerhaeuser has (1) waived error because it failed to plead the "enhanced injury" doctrine, (2) failed to preserve error because it did not argue the "enhanced injury" doctrine to the district court, and (3) failed to preserve error because it did not object to the introduction of evidence regarding comparative fault. Thermogas finally argues that Weyerhaeuser never offered a correct jury instruction on the "enhanced injury" doctrine.

In response, Weyerhaeuser asserts that Thermogas misunderstands its position. Weyerhaeuser argues it is not asserting and has never asserted that this is an "enhanced injury" case. For this reason, Weyerhaeuser further argues it was not required to (1) plead the "enhanced injury" doctrine, (2) introduce evidence on all the elements of the doctrine, (3) argue that theory to the district court, or (4) offer a jury instruction reflecting the elements of that doctrine.

The record Weyerhaeuser made on the instructions supports its position. Weyerhaeuser specifically argued that the jury was not to consider the cause of the fire when determining the fault, if any, of Thermogas. Weyerhaeuser pointed out to the district court that the regulations contemplate that LP tanks may well be subjected to fire, and for that reason, fire was foreseeable. The cause of the fire was therefore irrelevant. Weyerhaeuser takes the same position on appeal.

To support its argument that the cause of fire was not relevant, Weyerhaeuser cites, among other cases, *New England Mobile Fair, Inc. v. City of Boston*, 2 Mass.App.Ct. 404, 313 N.E.2d 149 (1974), and *Wollenhaupt v. Andersen Fire Equipment Co.*, 232 Neb. 275, 440 N.W.2d 447 (1989).

In *New England*, a fire in the plaintiff's bookstore burned unabated for a time because the defendant city had improperly closed the water valve leading to the sprinkler system in the bookstore. The city alleged contributory negligence on the ground that the bookstore had allowed its employees to smoke in an area where combustible materials were kept. In a bench trial, the trial court found for the city on its defense of contributory negligence and barred recovery. The appellate court reversed and remanded for a determination on the record of the total amount of damage that resulted from the lack of water to the sprinkler system. *New England*, 313 N.E.2d at 152–53.

On further review after the trial court made such determination, the appellate court allowed the plaintiff to recover the damages (sixty percent of its inventory) caused by the absence of a working sprinkler. *Id.* at 158. The court did so without consideration of how the fire started. The court stated:

[A] sprinkler system such as the one here involved is designed to control or contain a fire which might start through negligence. [The] plaintiff [never] sought to blame the city for allowing the fire to start; the gravamen of [the] declaration was that the ... plaintiff had suffered a further loss resulting directly from the city's negligence in preventing the proper operation of the sprinkler.

*Id.* at 154.

In *Wollenhaupt*, the plaintiff was working with highly flammable solvents when a fire erupted on his employer's premises. The plaintiff tried to run but the fire caught him, inflicting severe burns. The plaintiff and his employer sued a fire equipment company that had been responsible for the maintenance and testing of a fire protection system at the employer's plant. They alleged that the defendant had negligently serviced the fire protection system and as a result the system failed to extinguish the fire at the plant. They further alleged that had the system properly functioned, the plaintiff-employee would have suffered only slight injuries or no injuries at all. The defendant defended on the ground that the employer's negligence had caused the fire. The trial court instructed the jury to determine whether the employer's negligence was the sole proximate cause of the fire. *Wollenhaupt*, 440 N.W.2d at 448–49.

■ In reversing a verdict in favor of the defendant, the appellate court in *Wollenhaupt* stated:

[The plaintiff] is not claiming that [the defendant] caused the fire that injured him. Instead, the claim is that if [the defendant] had properly serviced [the fire protection system], the fire, whatev-

er its origin, would not have caused [the plaintiff] to suffer severe injury. *The origin of the fire in this case was therefore irrelevant.*

. . .

Again the claim is not that [the defendant] negligently started the fire, but that the fire, whatever its origin, would have been extinguished had the [fire protection system] been properly maintained and, had it been so maintained, [the plaintiff] would not have suffered injury.

*If a defendant has a duty to foresee a particular type of harmful force, such as a fire, and guard others against the harm that the force can do, and the defendant fails in this duty, the cause of the fire is irrelevant to the liability of the defendant.*

*Wollenhaupt*, 440 N.W.2d at 449–50 (emphasis added). In the last paragraph of this passage, the court is relying on principles implicating intervening cause, which we think determine the outcome of the issue before us.

An intervening cause is an event that "comes into active operation in producing the result *after* the negligence of the defendant. 'Intervening' is used in a time sense; it refers to later events." Prosser § 44, at 301. According to the same authority,

[i]f the intervening cause is one which in ordinary human experience is reasonably to be anticipated under the particular circumstances, the defendant may be negligent, among other reasons, because of failing to guard against it; or the defendant may be negligent only for that reason.

*Id.* at 303, 440 N.W.2d 447.

A defendant

cannot be relieved from liability by the fact that the risk, or a substantial or important part of the risk, to which the defendant has subjected the plaintiff has indeed come to pass. Foreseeable intervening forces are within the scope of the original risk, and hence of the defendant's negligence. The courts are quite generally agreed that intervening causes which fall fairly in this category will not supersede the defendant's responsibility.

*Id.* at 303–04, 440 N.W.2d 447; *accord Stevens v. Des Moines Indep. Cmty. Sch. Dist.*, 528 N.W.2d 117, 119 (Iowa 1995).

The court, not the jury, applies the rules restricting a defendant's responsibility under theories of intervening cause. *State v. Garcia*, 616 N.W.2d 594, 596 (Iowa 2000). When the intervening cause does not supersede the defendant's responsibility, evidence of such cause is not admissible. *Id.* at 597 (holding that physicians' allegedly "outrageous" treatment of gunshot victim was not sole proximate cause of victim's death, and thus expert testimony that physicians' gross negligence in removing tracheotomy tube from victim was cause of death was not admissible to establish defense of intervening cause in homicide prosecution in which there was substantial evidence that the gunshot wounds were a proximate cause of victim's death).

Here, Weyerhaeuser is not claiming that Thermogas caused the fire. Rather, Weyerhaeuser is claiming that, if the LP tank had not been defective and exploded prematurely when exposed to fire, the fire, whatever its origin, would not have caused Weyerhaeuser to suffer the damage it did suffer.

As mentioned, the federal regulations provide that LP tanks like the one here must not explode when placed in a fire. The same regulations require suppliers of such tanks to periodically inspect LP tanks to ensure they remain safe. The LP tank in question was two and one-half years past its mandatory testing date. Additionally, there was testimony that the LP tank had undergone early certifications, suggesting a problem with the tank. Finally, there was expert testimony that the LP tank exploded prematurely under the circumstances and that the premature explo-

sion must have been caused by a defect in the tank.

In the face of this evidence, it was for the district court, not the jury, to apply the rules of intervening cause. *See Garcia,* 616 N.W.2d at 596. In applying these rules, we think the district court should have reached the following conclusions. First, Thermogas had a duty to foresee that its LP tanks might be exposed to fire. Second, Thermogas had a duty to foresee that, if one of its tanks was so exposed and was defective, it could explode and cause harm. Third, there was evidence that the LP tank in question was exposed to fire, and because it was defective, it exploded and caused harm. Last, the fire and resulting explosion were therefore foreseeable intervening causes that did not supersede Thermogas' responsibility. Because the fire and resulting explosion were foreseeable intervening causes, the cause of the fire was irrelevant to Thermogas' liability.

For these reasons, the district court erred in refusing to instruct the jury that as to Thermogas the cause of the fire was irrelevant. This instruction was necessary because evidence of Weyerhaeusuer's negligence regarding the cause of the fire was properly before the jury on Weyerhaeusuer's claim against Clark (the clamp truck manufacturer).

## V. Refusal to Give *Res Ipsa Loquitur* Instruction.

Weyerhaeuser last contends that the district court erred in refusing to give the jury an instruction on *res ipsa loquitur.*

Thermogas responds that Weyerhaeuser was not entitled to such an instruction because it did not plead a claim of general negligence, but rather pleaded specific acts of negligence. Additionally, Thermogas asserts Weyerhaeuser failed to establish that the LP tank (1) was under Thermogas' exclusive control and (2) would have exploded even if ordinary care had been exercised. Finally, to establish a basis for a *res ipsa loquitur* instruction, Thermogas contends Weyerhaeuser had to eliminate its own negligence as a cause of injury, something Weyerhaeuser failed to do.

**A. General principles regarding *res ipsa loquitur.*** *Res ipsa loquitur* (Latin for "the thing speaks for itself") is only a rule of evidence. It is not a rule of substantive law. *Palleson v. Jewell Co-op. Elevator,* 219 N.W.2d 8, 13 (Iowa 1974). *Res ipsa loquitur* applies when " '(1) the injury is caused by an instrumentality under the exclusive control of the defendant, and (2) the occurrence is such as in the ordinary course of things would not happen if reasonable care had been used.' " *Brewster v. United States,* 542 N.W.2d 524, 529 (Iowa 1996) (quoting *Mastland, Inc. v. Evans Furniture, Inc.,* 498 N.W.2d 682, 686 (Iowa 1993)).

Provided there is substantial evidence to support both elements, the happening of the injury permits—but does not compel—the jury to draw an inference that the defendant was negligent. *Mastland,* 498 N.W.2d at 686. In this sense, *res ipsa loquitur* is a type of circumstantial evidence. *Brewster,* 542 N.W.2d at 528.

**B. Pleadings.** The plaintiff may plead, and the district court may submit to the jury, both specific negligence and general negligence under *res ipsa loquitur. Id.* at 530. The court submits the theories alternatively. *Id.* If the jury finds for the plaintiff on specific acts of negligence, it should not consider liability under *res ipsa loquitur. Id.*

Iowa is a notice-pleading state. *See* Iowa R.Civ.P. 69; *Adam v. Mt. Pleasant Bank & Trust Co.,* 355 N.W.2d 868, 870 (Iowa 1984). A petition need not plead ultimate facts to raise or preserve a claim. *Id.* The petition is sufficient if it "apprises the opposing party of the incident from which the claim arose and the general nature of the action." *Id.* Several reasons lead us to believe Ther-

mogas had sufficient notice that Weyerhaeuser was relying on *res ipsa loquitur* in addition to specific acts of negligence. One of the specifications of negligence was that Thermogas was negligent in supplying a propane tank to Weyerhaeuser that was defective and unreasonably dangerous *without* specifying how the tank was defective and unreasonably dangerous. We think this was a general allegation of negligence, notwithstanding the district court's motion-for-new-trial ruling that Thermogas had not pled *res ipsa loquitur*.

Additionally, prior to trial, Thermogas asked the district court in a motion in limine (which was not granted) to preclude Weyerhaeuser from presenting *solely circumstantial evidence* that the tank would not have exploded in the absence of a defect. This is precisely the type of evidence that *res ipsa loquitur* permits.

Additionally, at the hearing on pretrial motions, when Thermogas was trying to exclude the testimony of Weyerhaeuser's expert, Thermogas' counsel argued:

> [Weyerhaeuser's expert] said in this [supplemental rule 125] disclosure the tank exploded more quickly than a tank of proper integrity. He didn't say why or how the tank lacked proper integrity, and he did not identify a defect. Based on all his examination, [Weyerhaeuser's expert] is simply speculating that there must have been a defect. There is no physical evidence of a defect.

In reply, Weyerhaeuser's counsel stated:

> [Weyerhaeuser's expert] testified at his deposition, and his opinion disclosure in this case clearly indicates, that based on his review of the physical evidence he couldn't find a defect. The reason is because the tank blew up. His opinion is based on the *circumstantial evidence* in this case; namely the testimony of the relevant eyewitnesses.

(Emphasis added.)

Thermogas' motion in limine and counsel's arguments convince us Thermogas had notice that Weyerhaeuser was relying on *res ipsa loquitur* in addition to its specific allegations of negligence.

**C. Instrumentality under the exclusive control of the defendant.** As mentioned, one of the elements of *res ipsa loquitur* is that the injury is caused by an instrumentality under the exclusive control of the defendant. The district court refused to give a *res ipsa loquitur* instruction because it believed there was insufficient evidence on this element.

 Notwithstanding the "exclusive control" language, a plaintiff relying on *res ipsa loquitur* need not prove that the defendant had control of the instrumentality when the injury occurred. *Palleson*, 219 N.W.2d at 13. The plaintiff need only show that the defendant controlled the instrumentality at the *time of the alleged negligent act. Id.* Additionally, the plaintiff must show by a preponderance of the evidence (more likely than not) that (1) there was no change in the condition of the instrumentality, and (2) no intervening act that could have caused the event resulting in the injury. *Id.*

The "exclusive control" requirement is simply another way of saying that the injury must be traced to a specific instrumentality or cause for which the defendant was responsible. Prosser § 39, at 248. On this point, the treatise writer points out what showing the plaintiff must make:

> [Where causes for the injury other than a defendant's negligence are equally probable], there must be evidence which will permit the jury to eliminate them. This means, for example, that a plaintiff injured by the explosion of a beer bottle purchased from a retailer will be required to make some sufficient showing that the bottle was not cracked by mishandling after it left the defendant's plant. Again, however, the evidence need not be conclusive, and only enough is required to permit a finding as to the greater probability. The plaintiff is not required to do the impossible by ac-

counting for every moment of the bottle's existence since it left the defendant's plant; and it is enough if the plaintiff produces sufficient evidence of careful handling in general, and of the absence of unusual incidents, to permit reasonable persons to conclude that, more likely than not, the event was due to the defendant's negligence.

*Id.* at 249.

■■■ Here, the instrumentality was the tank and liquid propane that produced the explosion. The jury could find from the evidence that Thermogas provided the tank to Weyerhaeuser probably the day before the accident. Henriksen testified he found the tank in its regular location in the storage room and carried it to the clamp truck. He further testified that he inspected the tank for dents, cracks, "anything that was busted on it," and that he checked the nozzle that is used to open the valve to make sure it was not "busted or cracked." Henriksen further testified that he opened the valve on the tank one-half turn to allow sufficient propane to flow through the line so the truck could run. He then checked for leaks and found none.

We think from this evidence the jury could reasonably infer there was no change in the tank and liquid propane from the time it left Thermogas' possession until the explosion. The evidence was sufficient to generate a jury question on the control element of *res ipsa loquitur*.

We have already concluded that the cause of the fire—Weyerhaeuser's negligence—was a foreseeable intervening cause and for that reason the cause of the fire was irrelevant. We think the same reasoning applies with respect to the application of *res ipsa loquitur*.

■■■ **D. Injury-causing accident would not ordinarily occur in the absence of some negligence.** This element is "another way of stating an obvious principle of circumstantial evidence: that the event must be such that in the light of ordinary experience it gives rise to an inference that someone must have been negligent." *Id.* at 244. Usually, "the basis of past experience, from which the conclusion may be drawn that such events usually do not occur without negligence, is one common to the whole community, upon which the jury are simply permitted to rely." *Id.* at 247. "Even where such a basis of common knowledge is lacking, however, expert testimony may provide a sufficient foundation." *Id.*

*Res ipsa loquitur* applies if "there is no direct evidence to show cause of injury, and the circumstantial evidence indicates that the negligence of the defendant is the most plausible explanation for the injury." Prosser § 46, at 257. And,

> [i]n many cases, the inference to be drawn is a double one, that the accident was caused in a particular manner, and that the defendant's conduct with reference to that cause was negligent. The inference of negligence may arise either where a definite cause is known, or where the accident is more or less a mystery, with no particular cause indicated.

*Id.* § 39, at 247–48.

Here, there was no direct evidence of any defect in the tank. However, Weyerhaeuser's expert testified the premature explosion was the result of a defect in the tank. He based his opinion on the following. First, the expert examined the remnants of the tank. Second, both Henriksen and Chorny testified that, when they last saw the clamp truck, the flames were not impinging on the tank. Forty-five seconds later the tank exploded. Third, the expert conducted two tests—one on a normal, properly functioning LP tank to determine how quickly the tank would explode and another when the relief valve did not function.

In the first test, after twenty-eight minutes of direct flame on the bottom of the tank, where the flame would travel as much as it could along the liquid space in

the tank, the tank did not explode. The flame had scorched the bottom of the tank.

In the second test, the expert plugged the relief valve so it could not prevent an explosion. He then fired flames directly at the side of the tank at a ninety-degree angle, making contact with the space the liquid and the vapor occupied. After thirteen minutes the tank exploded.

Additionally, Fire Marshal Thomas Joseph Lanigan, who investigated the fire's origin, testified that in his opinion, the tank exploded prematurely. He also testified that he called the National Fire Protection Association, which authors the code regulations fire marshals follow, and gave them the "scenario of what had happened." The association responded that it had no reports of an LP tank explosion happening as quickly as this one had happened.

We must view all of this evidence in the light most favorable to Weyerhaeuser. In doing so, we think the evidence was sufficient to generate a jury question on the second prong of *res ipsa loquitur*.

The district court erred in not instructing on *res ipsa loquitur*.

### VI. Harmless Error.

■ Finally, Thermogas seeks to uphold the verdict in this case by contending the failure to submit strict liability and implied warranty was harmless error as was the district court's failure to instruct on *res ipsa loquitur*. The basis for this contention is the jury's determination that Thermogas' actions though negligent were not the proximate cause of Weyerhaeuser's damages.

As Weyerhaeuser points out, a jury deliberating upon multiple theories of liability must reach independent decisions as to each question on a special verdict form. Because the jury found no proximate cause on the theory of specific acts of negligence does not mean the jury would have done the same as to the strict-liability and implied-warranty claims. The latter claims

are theories having elements different from the elements of negligence.

As for *res ipsa loquitur*, Weyerhaeuser was deprived of an instruction that would have allowed the jury to infer not only negligence but *causation* from the facts and circumstances surrounding an otherwise unexplained explosion. For all we know, the jury found no proximate cause because there was lacking direct evidence as to the defect in the tank and the resulting explosion.

Finally, the jury was allowed to consider the cause of the fire—Weyerhaeuser's negligence—in determining Weyerhaeuser's claim of negligence against Thermogas. The jury could have therefore believed Weyerhaeuser's negligence was the *sole* proximate cause of its damages. This is especially true because the jury was allowed to consider Chorny's action in driving the truck with the parking brake engaged as negligence against Weyerhaeuser. This was the action that precipitated the fire. The outcome might well have been different if the jury had been instructed to disregard the cause of the fire in deciding the negligence claim.

For these reasons, we reject Thermogas' harmless-error contention.

### VII. Disposition.

In sum, we conclude that the trial court should have (1) submitted to the jury Weyerhaeuser's claims of strict liability and breach of implied warranty of merchantability, (2) instructed the jury to disregard the cause of the fire in considering Weyerhaeuser's claims against Thermogas, and (3) instructed the jury on *res ipsa loquitur*. Its failures in each of these instances were prejudicial and warranted a new trial. The district court's failure to grant a new trial was error. We therefore reverse and remand for a new trial.

Although we have not addressed all of the parties' contentions, we have carefully considered them. Those we have not ad-

dressed either lack merit or were not preserved for our review.

### REVERSED AND REMANDED.

All justices concur except TERNUS and CADY, JJ., who concur in part and dissent in part. McGIVERIN, S.J.,* participates in place of CARTER, J., who takes no part.

TERNUS, J. (concurring in part and dissenting in part).

I concur in the majority opinion in all respects except Division V. I think the trial court correctly refused to instruct on the *res ipsa loquitur* doctrine. Although expert testimony established that the explosion would not have occurred unless there was a defect in the tank, I do not think this testimony establishes that the explosion would not have occurred in the absence of Thermogas's negligence. There was no evidence that a defect would not have existed unless Thermogas was negligent or that the defect would have been discovered had Thermogas exercised ordinary care in its inspection or recertification of the tank. Therefore, I think there was insufficient evidence that the accident would not ordinarily occur in the absence of Thermogas's negligence.

CADY, J., joins this concurrence in part and dissent in part.

---

* Senior judge assigned by order pursuant to Iowa Code section 602.9206 (1999).