APPEL, Justice
(concurring specially).
In this case, the court removes an inappropriate formalistic barrier to achieving increased representation of African-Americans and other minority groups on our juries by overturning precedent which, in my view, was plainly incorrect. While this barrier-removing exercise is important, and even essential, we have a long way to go in ensuring fairness to racial minorities in our criminal justice system,
I write separately to express my view that a criminal defendant is entitled to an accurate, properly worded implicit-bias jury instruction to assist the jury in reaching a fair and unbiased verdict.,
I. Overview of Implicit Bias,
A. Introduction: What Are We Talking About? What is this new-fangled “implicit bias” business all about? Despite the new-sounding, term, however, the concept of implicit biases is supported by longstanding theories of heuristics and cognitive. biases. Social scientists have long demonstrated that we tend to “anchor” our judgments about current perceptions in what we.have experienced in the past. See *831 Thomas Mussweiler & Fritz Strack, Hypothesis-Consistent Testing and Semantic Priming in the Anchoring Paradigm: A Selective Accessibility Model, 35 J. Experimental Soc. Psychol. 136, 147 (1999) (describing the field of “heuristics and biases” and canvassing the literature, beginning in 1974, studying the anchoring effect). Social scientists have identified an “endowment effect,” where we tend to give irrational attachment to initial distributions of property rights, grants, or other entitlements. See Ying Zhang & Ayelet Fishbach, The Role of Anticipated Emotions in the Endowment Effect, 15 J. Consumer Psychol. 316, 316 (2005). And, social scientists have observed “hindsight bias” which makes us believe what happens today should have easily been foreseen. See Jeffrey J. Rach-linski, A Positive Psychological Theory of Judging in Hindsight, 65 U. Chic. L. Rev. 571, 571-75 & n. 2-4 (1998) (describing the hindsight bias and citing to the psychological research).
The National Center for State Courts has published a succinct description of implicit bias by a leading expert. Jerry Kang, Implicit Bias: A Primer for Courts 1-6 (August 2009) http://wp.jerrykang.net.s 110363.gridserver.com/wp-content/uploads/ 2010/10/kang-Implicit-Bias-Primer-for-courts-09.pdf [hereinafter Kang, Implicit Primer]. In the Implicit Primer, Kang explains that all of us, in our daily lives, process information and develop “sche-mas,” or templates of knowledge that organize individual bits of information into more generalized concepts. Id. at 1.
Kang offers the following illustration of a schema: when a smiling person hands us a laminated paper with detailed descriptions of food and prices, we know what the gesture means. Id. Kang explains that we categorize people in the same way. Id. According to Kang, “We naturally assign people into various social categories divided by salient and chronologically accessible traits, such as age, gender, race, and role.” Id. Many of these shorthand schemas may be unconscious, involving “implicit social cognitions that guide our thinking about social categories.” Id.
The notion of implicit bias has recently received considerable attention in the context of providing justice to African-American and other minority defendants in criminal trials. See Michelle Alexander, The New Jim Crow: Mass Incarceration in the Age of Colorblindness 106-08 (2012). The general notion in the literature is that because of implicit bias, racial stereotyping may be unconscious and not explicit. In 2006, the California Law Review published papers arising from symposia on implicit bias and behavioral realism with implications for the courtroom. See, e.g., R. Richard Banks et al., Discrimination and Implicit Bias in a Racially Unequal Society, 94 Cal. L. Rev. 1169, 1189-90 (2006); Anthony G. Greenwald & Linda Hamilton Krieger, Implicit Bias: Scientific Foundations, 94 Cal. L. Rev. 945, 965-67 (2006); Christine Jolls & Cass R. Sunstein, The Law of Implicit Bias, 94 Cal. L. Rev. 969, 995-96 (2006) [hereinafter Jolls]; Linda Hamilton. Krieger & Susan T. Fiske, Behavioral Realism in Employment Discrimination Law: Implicit Bias and Disparate Treatment, 94 Cal. L. Rev. 997, 1061-62 (2006) [hereinafter Krieger, Behavioral Realism], A review of implicit bias research and its potential application was conducted in a 2012 article coauthored by United States District Court Judge Mark Bennett. See Jerry Kang et al., Implicit Bias in the Courtroom, 59 UCLA L. Rev. 1124,1128-34 (2012). A large body of academic literature has emerged on the subject. See, e.g., Mark W. Bennett, Unraveling the Gordian Knot of Implicit Bias in Jury Selection:.The Problems of Judge-Dominated Voir Dire, The Failed Promise of Batson, and Proposed Solu *832 tions, 4 Harv. L. & Pol’y Rev. 149, 154-58 (2010) [hereinafter Bennett] (reviewing the literature); Jennifer S. Hunt, Race, Ethnicity, and Culture in Jury Decision Making, 11 Ann. Rev. L. & Soc. Sci. 269, 273-74 (2015); Jerry Kang & Kristin Lane, Seeing Through Colorblindness: Implicit Bias and the Law, 58 UCLA L. Rev. 465, 473-81 (2010) [hereinafter Kang, Seeing Through Colorblindness] (summarizing the science).
B. The Science Behind the Theory of Implicit Bias. The leading approach documenting implicit bias is the Implicit Association Test (IAT). See Allen R. McConnell & Jill M. Leibold, Relations Among the Implicit Association Test, Discriminatory Behavior, and Explicit Measures of Racial Attitudes, 37 J. Experimental Soc. Psychol. 435, 435 (2001). The IAT measures unconscious preferences by comparing the speed with which we make certain associations. See Anthony G. Greenwald et al., Measuring Individual Differences in Implicit Cognition: The Implicit Association Test, 74 J. Personality & Soc. Psychol. 1464, 1464-65 (1998). Other kinds of measurements of implicit bias have also been developed. See id. at 1477 (describing the “evaluative priming method” as the chief method used to measure implicit biases prior to the IAT). While a detailed summary of the research results are beyond the scope of this opinion, a substantial body of literature comes to the conclusion that implicit bias is substantial and real. See, e.g., David L. Faigman et al., A Matter of Fit: The Law of Discrimination and the Science of Implicit Bias, 59 Hastings L.J. 1389, 1434 (2008); John T. Jost et al., The Existence of Implicit Bias Is Beyond Reasonable Doubt: A Refutation of Ideological and Methodological Objections and Executive Summary of Ten Studies that No Manager Should Ignore, 29 Res. Organizational Behav. 39, 41 (2000); Kang, Seeing Through Colorblindness, 58 UCLA L. Rev. at 519-20.
C. Activities of American Bar Association and National Center for State Courts on Implicit Bias.
1. American Bar Association. The Section on Litigation of the American Bar Association has developed an “Achieving an Impartial Jury Toolbox” (AIJ Toolbox). Am. Bar Ass’n, Achieving an Impartial Jury (AIJ) Toolbox 1 (2015) [hereinafter AIJ Toolbox]. In this publication, the AIJ Toolbox notes there is more to discrimination than express bias, stating “research demonstrates that self-reports are often unreliable because we may not know our implicit biases and associations or we may not choose to reveal them.” Id. at 8. The AIJ Toolbox further notes, “The workings and results of the IAT are widely documented.” Id. at 9. The AIJ Toolbox explains, “Using IAT data, researchers have found pervasive implicit bias in associations in favor of Whites as compared to Blacks, women in families as compared to women in careers, and the abled as compared to the disabled.” Id. (footnotes omitted). The AIJ Toolbox goes on to state “[w]hile these implicit associations are made without our express knowledge, and often contrary to or honestly held beliefs, they nevertheless influence our responses and decisions.” Id. at 10 (footnotes omitted).
The AIJ Toolbox includes an instruction on implicit bias. Id. at 17-20. The AIJ Toolbox concedes that arriving at the language was challenging arid that fundamental questions were raised whether highlighting the notion of implicit bias would do more harm than good. Id. at 16. In addition to its own draft instruction, the AIJ Toolbox also presents the implicit-bias instruction used by Judge Bennett, a California jury instruction, and a race-switch- *833 mg instruction developed by Professor Cynthia Lee. Id. at 20-22.
2. National Center for State Courts. The National Center for State Courts (NCSC) has also been active in the field of implicit bias. Although publication does not imply endorsement, the NCSC funded and published a summary on implicit bias by Jerry Kang. See Kang, Implicit Primer, at I. The NCSC also has published a study of implicit-bias instructions. See Jennifer K. Elek & Paula Hannaford-Agor, Nat’l Ctr. for State Cts., Can Explicit Instructions Reduce Expressions of Implicit Bias: New Questions Following a Test of Specialized Jury Instruction 2 (April 2014). The study found no significant effects of an implicit-bias instruction on judgments of guilt, confidence, strength of the prosecution’s evidence, or sentence length. Id. at 8. As a result, the researchers were unable to render a verdict on the utility of a specialized jury instruction. Id.
D. Judicial Acceptance of Implicit-Bias Theory. Although the United States Supreme Court has not expressly embraced the theory of implicit bias, various members of the court have done so. For instance, Justice Ginsburg in Grutter v. Bollinger has noted, “It is well documented that conscious and unconscious race bias ... remain[s] alive in our land, impeding realization of our highest values and ideals.” 539 U.S. 306, 345, 123 S.Ct. 2325, 2347-48, 156 L.Ed.2d 304 (2003) (Ginsburg, J., concurring). Similarly, Justice O’Connor in Georgia v. McCollum wrote, “It is by now clear that conscious and unconscious racism can affect the way white jurors perceive minority defendants and the facts presented at their trials, perhaps determining the verdict of guilt or innocence.” 505 U.S. 42, 68, 112 S.Ct. 2348, 2364, 120 L.Ed.2d 33 (1992) (O’Connor, J., dissenting). Justice White also observed in Turner v. Murray that “[m]ore subtle, less consciously held racial attitudes could also influence a juror’s decision in this case.” 476 U.S. 28, 35, 106 S.Ct. 1683, 1688, 90 L.Ed.2d 27 (1986). In his dissent in Turner, Justice Brennan declared it to be “incontestable that subconscious, as well as express, racial fears and hatreds operate to deny fairness to the person despised.” Id. at 42, 106 S.Ct. at 1691 (Brennan, J., dissenting).
We have also recognized the reality of implicit bias. In Pippen v. State, this court considered whether plaintiffs could bring a class action under Title VII and the Iowa Civil Rights Act against thirty-seven different executive branch departments as a result of disparate hiring practices. 854 N.W.2d 1, 5 (2014). Among other evidence, the plaintiff offered expert testimony from Anthony Greenwald and Cheryl Kaiser, leading experts on implicit bias. Id. at 6. The majority opinion held that under applicable law, a class action across thirty-seven departments could not be maintained. Id. at 32. Importantly, in a concurring opinion, Justice Waterman wrote, “Implicit-bias theory helps explain how statistical disparities can result without intentional discrimination.” Id. at 33 (Waterman, J., concurring specially). He further wrote that “there undoubtedly was subjectivity and—as the plaintiffs credibly demonstrated—implicit bias in multiple State hiring decisions.” Id. at 41. Nothing in the Pippen majority opinion contradicted Justice Waterman’s observations.
II. Instructions to Jury as Remedy for Implicit Bias.
A. Introduction. One potential remedy in a jury trial is a jury instruction that accurately describes the potential problem of implicit bias and properly instructs the jurors of the need to avoid making a decision based upon it. We have stated a defendant is entitled to a jury instruction *834 that is germane to the case and accurately states the law. Alcala v. Marriott Int’l, Inc., 880 N.W.2d 699, 707 (Iowa 2016); Weyerhaeuser Co. v. Thermogas Co., 620 N.W.2d 819, 823-24 (Iowa 2000); Sonnek v. Warren, 622 N.W.2d 45, 47 (Iowa 1994). While w;e have also stated the failure to give a cautionary instruction is reviewed for abuse of discretion, State v. Webb, 516 N.W.2d 824, 831 (Iowa 1994), implicit bias is so pervasive and the harm from implicit bias so difficult to prove in a particular case that I conclude a criminal defendant is entitled to an implicit-bias instruction upon request. Examples of jury instructions provided in the AIJ Toolbox include the AIJ model instruction, the instruction utilized by Judge Bennet,' an implicit-bias instruction from California, and a race-switching instruction suggested by Professor Lee. See AIJ Toolbox at 17-22.
B. Rationale, for Implicit-Bias Instruction, The rationale for an implicit-bias instruction is that it is consistent with the way the human mind works and is an appropriate remedy to minimize the impact of implicit bias in jury determinations. Research suggests that the problem of implicit bias may be moderated by attention to the issue. See Irene V. Blair, The Malleability of Automatic Stereotypes and Prejudice, 6 Personality & Soc. Psychol. Rev. 242, 266 (2002) (“[Results of these tests show that automatic stereotypes and prejudice can be moderated by a wide variety of events.... ”); Anna Roberts, (Reforming the Jury: Detection and Disinfection of Implicit Juror Bias, 44 Conn. L. Rev. 827, 836 (2012) (noting that IAT researchers find implicit associations “malleable”).
C. Objections to Implicit-Bias Jury Instruction.
1. Rejection of social science in favor of formalistic legal structures. One potential objection is that courts should not look to social science in the development of law generally, but should instead rely on formalistic legal structures that have historically been applied by the legal system. Although historically embraced approaches to law have undoubted value, the law must be rooted in reality. Scientific developments should affect legal doctrine. For instance, evolving science has significantly affected this court’s approach to the application of the Iowa Constitution’s cruel and unusual punishment clause with respect to juveniles. See, e.g., State v. Sweet, 879 N.W.2d 811, 839 (Iowa 2016); State v. Ragland, 836 N.W.2d 107, 115 (Iowa 2013); State v. Null, 836 N.W.2d 41, 74 (Iowa 2013). Similarly, as shown in the seminal case of State v. Henderson, the law of eyewitness identification is being reevaluated in light of evolving science that challenges broad-brush, undifferentiated views on the reliability of eyewitness identifications. 208 N.J. 208, 27 A.3d 872, 917 (2011).
2. Not supported by social science research, Another approach is to attack the underlying scientific basis of a jury instruction for implicit bias. This challenge breaks down into two questions. First, is there ’ a scientific basis for implicit bias generally? Second, if there is, has it been scientifically demonstrated that a proposed jury instruction is an appropriate and effective remedy?
On the first question, I conclude that there is strong scientific evidence of the existence of implicit bias. Whether an instruction will be effective is another question. Unlike the question of whether implicit bias exists, where there is a large literature, there is not a body of science demonstrating the impact of an implicit-bias instruction, on a jury and, to the extent it exists, it appears inconclusive. See AIJ Toolbox, at 15 n.20.
*835 But a body of social science evidence demonstrating utility is not required of our jury instructions. The instructions of the Iowa State Bar. Association, for example, have not been subjected to social science analysis for their likely impact as have, for instance, questions on the bar examination developed by the National Conference of Bar Examiners. Instead of requiring social science confirmation, we allow various wordings of legal concepts in jury instructions if they accurately reflect the law. If a body of social science research supporting the efficacy of each jury instruction were required, we would have no approved jury instructions and no judge could craft his or her own case-specific instructions without social science support.
3. Inflaming jurors against defendant. The concern is expressed that an implicit-bias jury instruction could potentially inflame jurors. This concern may be put in the “anything is possible” file. There is certainly no social science support for that proposition. In any event, it is certainly equally possible, and probably more likely, that a jury instruction on the presumption of innocence would well inflame a juror who believes that the criminal justice system affords too many rights to criminal defendants and is too lenient. It is ironic to deny a defendant an accurate instruction on implicit racial bias sought by the defendant’s lawyer on the ground that, in some conceivable scenarios, it might, perhaps, maybe, be counterproductive on particular jurors.
In any event, we ordinarily leave it up the defendant’s counsel to make the determination as to whether his client will benefit from a particular instruction. See Lamphere v. State, 348 N.W.2d 212, 217 (Iowa 1984) (holding that counsel- is not ineffective for failing to request every legally supportable jury instruction). There is no mandatory requirement that a lawyer seek an instruction to which the defendant is entitled but which, in the lawyer’s professional judgment, may do more harm than good. It is fundamental to our adversary system, however, that defendant’s counsel, and not the court, make that strategic decision.
4. The problem of overcorrection. Another possible objection is the fear that an implicit-bias instruction could potentially lead to overcorrection. The potential of overcorrection, however, inheres in many jury instructions. That said, a properly worded implicit-bias instruction should minimize the risks of overcorrection by emphasizing that the jury’s decision should be based on facts and evidence and not on stereotypes. Further, as noted by Professor Lee, “until there is some tangible evidence that making race salient would lead jurors to overcorrect in racially unjust ways, it seems imprudent not to even attempt to deal with the racial bias we know exists.” Cynthia Lee, Making Race Salient: Trayvon Martin and Implicit Bias in a Not Yet Post-Racial Society, 91 N.C. L. Rev. 1556, 1608 (2013).
D. Use of an Implicit-Bias Instruction in This Case. I agree with the basic premise that our law should be based on a realistic understanding of human behavior. See Jolls, 94 Cal. L. Rev. at 995. As noted by Oliver Wendell Holmes many years ago, “The first call of a theory of law is that it should fit the facts.” Krieger, Behavioral Realism, 94 Cal. L. Rev. at 997 (quoting Oliver Wendell Holmes, The Common Law, 167 (1963)). I am also convinced that implicit bias is real, pervasive, and potentially outcome determinative in a criminal trial. I further believe that other remedies, such as the remedy theoretically available under Batson v. Kentucky, 476 U.S. 79, 93-98, 106 S.Ct. 1712, 1721-24, 90 L.Ed.2d 69 (1986), are ineffective. See Bennett, 4 Harv. L. & Pol’y Rev. at 161-68; Antony Page, Batson’s Blind Spot: Uncon- *836 scions Stereotyping and the Peremptory Challenge, 85 B.U. L. Rev. 155, 178-79 (2005) (characterizing Batson as ineffective). Courts should not get unduly stressed when presented with an accurate instruction designed to address a real and persistent problem.
As a result, I conclude that a criminal defendant is entitled to an accurate, appropriately worded implicit-bias instruction upon request. In my view, the other instructions in this case did not adequately address the problem of implicit bias. Ideally, such an instruction should be given at the beginning of jury selection. I would not dictate the specific working of an implicit-bias jury instruction, but the model instruction of the ABA, Judge Bennett’s instruction, and the implicit-bias instruction in the District of Columbia and California provide meaningful guidance. See AIJ Toolbox, at 17-22.
I acknowledge this step would be a departure from current law.[13] It was not long ago, however, when even express racial discrimination was permitted in courtrooms all across the country. An implied-bias instruction is not innovation for the sake of innovation, but reflects a reassessment of courtroom conduct based on evolving science and the aspiration of achieving fundamental fairness that is indispensable to our system of justice. Refined efforts to achieve fairness are not only important to the participants in trials but to public confidence in our system of justice.
There is, of course, a question of timing. There always is a question of timing. Every substantive change may be resisted by the refrain “not now, but later.” Later, of course, often explicitly or implicitly means never. For me, in light of the large body of science demonstrating implicit bias, the time for an implicit-bias instruction in Iowa courtrooms is now.
Cady, C.J., and Wiggins, J., join this special concurrence.

. The few cases from other jurisdictions I have found that have directly addressed an implicit-bias instruction, as opposed to a more general racial-bias instruction, have determined that the giving of such an instruction is within the discretion of the district court judge. See United States v. Graham, 680 Fed.Appx. 489, 492-93 (8th Cir.2017) (per curiam); State v. Roseboro, 351 N.C. 536, 528 S.E.2d 1, 13 (2000). These cases are not germane under Iowa law because Iowa employs a different substantive standard than federal law to determine whether a party is entitled to an instruction. In Graham, the United States Court of Appeals for the Eighth Circuit stated that jury instructions must fairly inform the jury "of the essential elements of the offense charged, as well as the government’s burden of proof.” 680 Fed.Appx. at 492. Under Iowa law, a defendant is entitled to the submission of a jury instruction if it "correctly states the applicable law and is not embodied in other instructions.” Sonnek, 522 N.W.2d at 47. We have no requirement that a proposed jury instruction must relate to an essential element of the offense, or the government's burden of proof, in order to reverse for failure to give a jury instruction.
The question in Roseboro was whether a capital murder defendant was constitutionally entitled to an instruction for the jury to disregard explicit and implicit racial biases in the penalty phase of the trial. Id. at 554. Here, we are not dealing with the question of whether due process requires an implicit-bias instruction, so the Supreme Court of North Carolina's holding may not be applicable. Additionally, there is no evidence that the Rose-boro court considered the research on how racial bias pervasively infects an imposition of the death penalty when the defendant is African-American and the victim is Caucasian. It seems unlikely that the North Carolina court did consider this research because it wrote that the defendant’s proposed instructions would "in effect, inject[] racial bias into the jurors’ consideration.” Id. at 555.